IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 00-41112

_____

JENEVA FRAZAR, Etc., ET AL.,

                                                            Plaintiffs,

LINDA FREW, as next friend of her minor child,
Carla Frew; MARIA AYALA, as next friend of her
minor children, Christopher Arizola, Leonard Jimenez
and Joseph Veliz; MARY FISHER, as next friend of
her minor child, Tyrone T. Edwards; MARY JANE
GARZA, as next friend of her minor children,
Hilary Garza and Sarah Renea Garza,

                                                            Plaintiffs-Appellees.

                              versus

DON GILBERT, Etc., ET AL.

DON GILBERT, Commissioner of the Texas Health
and Human Services Commission in his official
capacity; LINDA WERTZ, Texas State Medicaid
Director; BRIDGETT COOK, employee of Texas
Department of Health in official capacity; SUSAN
PENFIELD, M.D., employee of the Texas Department
of Health in official capacity; EDUARDO SANCHEZ,
M.D., Texas Commissioner of Health,

                                                            Defendants-Appellants.

No. 01-40667

JENEVA FRAZAR, Etc., ET AL.,

Plaintiffs,

LINDA FREW, as next friend of her minor child,
Carla Frew; CARLA FREW; MARIA AYALA, as
next friend of her minor children, Christopher
Arizola, Leonard Jimenez and Joseph Veliz; MARY
FISHER, as next friend of her minor child, Tyrone T.
Edwards; MARY JANE GARZA, as next friend of
her minor children, Hilary Garza and Sarah Renea
Garza; CHARLOTTE GARVIN, as next friend of
her minor children Johnny Martinez, Brooklyn Garvin
and BreAnna Garvin; SHANNON GARCIA, as next
friend of her minor children, Andrew Garcia, Marisha
Garcia, Stephen Sanchez and Allison Sanchez,

Plaintiffs-Appellees,

versus

RICHARD LADD, Etc., ET AL.,

LINDA WERTZ, Texas State Medicaid Director;
BRIDGETT COOK, employee of Texas Department
of Health in official capacity; SUSAN PENFIELD,
M.D., employee of the Texas Department of Health
in official capacity; DON GILBERT, Texas
Commissioner of Health and Human Services;
EDUARDO SANCHEZ, M.D., Texas Commissioner
of Health,

Defendants-Appellants.

2

Appeals from the United States District Court for
the Eastern District of Texas
_____

July 24, 2002

Before REAVLEY, SMITH and DENNIS, Circuit Judges.

REAVLEY, Circuit Judge:

State officials take interlocutory appeals from orders of the district court that refused to modify a prior consent decree and required detailed state action in the administration of the Medicaid program to afford health care to the certified class of indigent children. We vacate the orders because the court has exceeded its jurisdiction.

The court expended great effort in developing a record of unmet medical needs of children in Texas that must be of concern to the people and authorities of the State, as to the district judge. The State did however have a substantial program to meet the medical needs of the class members. The number of State employees and contract workers assigned to that program has increased from about ten in 1993 to almost 500 in 2000. Participation by eligible youth has increased; the "participation ratio," a measure of the percentage of eligible persons who have received at least one screening service annually, and which must be reported to the Health Care Finance Administration, the federal agency responsible for administering the Medicaid program,[1] increased from 18 percent

_____

[1] See Hope Medical Group for Women v. Edwards, 63 F.3d 418, 421 (5th Cir. 1995).

3

in 1991 to 66 percent in 1998.  The utilization of dental services also increased, and the rate now is well above the national average.  Texas spends more that any other state on informing and outreach programs.  In 1999 it made about 4.8 million outreach contacts to class members (up from about 2 million such contacts in 1995), including about 1.8 million voice-to-voice or face-to-face contacts.

The State now operates a toll-free telephone service for the benefit of class members, and the district court recognized that the State has made striking improvement in the operation of this service.[2]  The State has a medical transportation program, and from 1993 to 1999 the number of rides increased from about 750,000 trips to 2.5 million trips.  The State offered evidence that its Department of Health is not aware of a single eligible person who has requested services and not subsequently received them.

Nevertheless, some children are unable or, for whatever reason, fail to take full advantage of the services.  The plaintiffs and district court see the answer to be oversight and enforcement by the court.  Aside from the lack of judicial competence to meet this task, we hold that the court lacks jurisdiction to cure the problems or to direct the particular means and methods of this care.

BACKGROUND

This suit began in 1993 when Jeneva Frazar and Linda Frew, suing on behalf of their children, alleged that the State of Texas (the State) and the named state officials (the

---

[2] Frew v. Gilbert, 109 F. Supp. 2d 579, 645 n.136 (E.D. Tex. 2000).

state defendants) were failing to provide federally mandated Medicaid benefits to the children under the Texas version of the early and periodic screening, diagnostic, and treatment services (EPSDT) program. The Medicaid program provides federal funding for medical services to the poor.[3] State participation is voluntary, but once a state joins the Medicaid program, it is charged with administering a state plan and must meet certain federal mandates.[4] A participating state must have an EPSDT program which provides services described in the Medicaid Act.[5]

---

[3] See <u>Wilder v. Va. Hosp. Ass'n</u>, 496 U.S. 498, 502 (1990).

[4] <u>Id.</u>

[5] Under 42 U.S.C. § 1396a(a)(43), a state Medicaid plan must provide for:

   (A) informing all persons in the State who are under the age of 21 and who have been determined to be eligible for medical assistance including services described in section 1396d(a)(4)(B) of this title, of the availability of early and periodic screening, diagnostic, and treatment services as described in section 1396d(r) of this title and the need for age-appropriate immunizations against vaccine-preventable diseases,
   (B) providing or arranging for the provision of such screening services in all cases where they are requested,
   (C)) arranging for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment the need for which is disclosed by such child health screening services, and
   (D) reporting to the Secretary (in a uniform form and manner established by the Secretary, by age group and by basis of eligibility for medical assistance, and by not later than April 1 after the end of each fiscal year, beginning with fiscal year 1990) the following information relating to early and periodic screening, diagnostic, and treatment services provided under the plan during each fiscal year:
     (i) the number of children provided child health screening services,
     (ii) the number of children referred for corrective treatment (the need for which is disclosed by such child health screening services),

5

Plaintiffs complained that the Texas EPSDT program, known as the Texas Health Steps program, had failed to provide federally mandated services. They claimed that the EPSDT program did not meet various requirements of 42 U.S.C. §§ 1396a(a) and 1396d(r), federal regulations, and provisions of the State Medicaid Manual. Specifically, plaintiffs claimed that the EPSDT program (1) did not have policies or procedures to assure that class members receive health, dental, vision, and hearing screens, (2) did not meet annual participation goals set by the Secretary of Health and Human Services, (3) did not effectively inform eligible persons of the availability of EPSDT services, (4) did not employ policies and procedures to provide or arrange for other necessary measures to correct or ameliorate physical and mental conditions discovered by the screening services, (5) did not provide case management services to all EPSDT recipients as needed, and (6) did not provide services uniformly in all political subdivisions of the State.

---

(iii) the number of children receiving dental services, and
(iv) the State's results in attaining the participation goals set for the State under section 1396d(r) of this title.

"Early and periodic screening, diagnostic, and treatment services" referenced in the above statutory provision is defined in 42 U.S.C. § 1396d(r) to include certain screening, vision, dental, hearing, and other services.

Plaintiffs sought injunctive relief under 42 U.S.C. § 1983 and requested class certification. In 1994 the district court certified the case as a class action. According to the district court the class consists of over 1.5 million Texas youth.[6]

The parties proceeded to conduct settlement negotiations, and agreed to a consent decree. The record indicates that this proposed consent decree was reached after the district court ordered the parties to pursue a settlement.[7] The district court conducted a fairness hearing on the proposed settlement, see FED. R. CIV. P. 23(e), and in February 1996 approved and entered the consent decree.

"A consent decree is akin to a contract yet also functions as an enforceable judicial order."[8] The consent decree in the pending case is a lengthy document and orders the state defendants to implement many highly detailed and specific procedures relating to the EPSDT program.[9] It contemplates continuing oversight of the agreement by the

---

[6] Frew, 109 F. Supp. 2d at 587.

[7] A "Joint Report Concerning the Progress of Settlement Negotiations" indicates that the district court ordered the parties to meet eight times in pursuit of a settlement.

[8] United States v. Chromalloy American Corp., 158 F.3d 345, 349 (5th Cir. 1998).

[9] By way of example, the decree orders the state defendants, in administering the EPSDT program, to: use certain terms, in English and Spanish, for the services it provides to Medicaid recipients (consent decree ¶ 16); mail letters to recipients, in English and Spanish, at certain designated times and containing certain information, regarding checkups, and provide brochures, fliers, and medical identification cards to recipients (¶ 17); provide certain verbal and written information to recipients through eligibility workers, and provide training to these workers (¶¶ 20-22); provide outreach units to provide specified reports and outreach services to specified groups of recipients, such as those recipients who miss checkups (¶¶ 25-64, 96, 148); employ a simplified form for medical checkups (¶ 90); maintain updated lists of health care providers (¶ 93);

district court. It states in paragraph 6 that "the parties agree and the Court orders" the state defendants to implement the changes and procedures to the EPSDT program set out in the decree, and provides in paragraph 303 that if the state defendants fail to comply with the terms and intent of the decree, the plaintiffs "may request relief from this Court." In paragraphs 306 and 307, the state defendants are required, "[f]or the duration of this Decree," to submit "monitoring reports" four times a year to the court. The reports must include a chart which identifies "each paragraph of this Decree that obliges Defendants to act and each required action. The chart will further state the status of each activity." The decree places no limit on its duration.

A.    Appeal No. 00-41112

---

provide a cost of living adjustment for medical checkups (¶¶ 98-99); provide "innovative efforts to recruit all relevant professional schools to become EPSDT providers" (¶ 102); provide and facilitate training about various specified Medicaid and EPSDT subjects to professional schools and health care providers (¶¶ 104-131); adopt various procedures to promote dental care including procedures to combat baby bottle tooth decay, provide for the use of dental sealants, prepare various reports, and audit dentists (¶¶ 143-174); provide training, outreach, and other services for the benefit of special groups, including farm workers, recipients receiving care from managed care organizations, teens, and neglected and abused children (¶¶ 175-212); provide information, outreach, assessments, corrective action plans, reimbursements, and new regulations in order to alleviate transportation problems (¶¶ 213-238); provide a toll-free phone assistance system that is "more hospitable and helpful to recipients than the past system," provides specified information to recipients, and is adequately staffed by well-trained personnel (¶¶ 242-47); prepare and implement a case management plan for the EPSDT program (¶¶ 264-70); implement a "statewideness" plan that increases the percent of recipients receiving checkups in those counties of the State with low checkup rates (¶¶ 271-281); agree with the plaintiffs on health outcome indicators, "arrange for studies to evaluate the health of the EPSDT population," and develop corrective action plans where goals are not met (¶¶294-96); and revise the State's computerized management information system (¶ 298).

8

On November 10, 1998, plaintiffs filed a "Motion to Enforce Consent Decree," alleging that the state defendants had not complied with numerous paragraphs of the consent decree.[10] The state defendants objected to the court's jurisdiction to grant relief under 42 U.S.C. § 1983 and because of the Eleventh Amendment.

The district court conducted an evidentiary hearing, and, on August 14, 2000, entered a lengthy memorandum opinion. The court held that numerous provisions of the consent decree had been violated and that the consent decree was enforceable. By a separate order entered August 14, 2000, which the court characterized as its initial "order of enforcement," it directed defendants to mail to the court and opposing counsel, within 60 days, "proposed corrective action plans to remedy each violation of the consent decree detailed in Part One of this court's Memorandum Opinion." The plaintiffs were then given 30 days to respond to defendants' proposed corrective action plans.

---

[10] As detailed by the district court, the plaintiffs alleged that the defendants had violated the consent decree by failing to:

> 1) implement properly the outreach program and deliver required outreach reports; 2) assure that all class members receive medical and dental checkups; 3) develop and implement annual corrective action plans both for counties that lag behind the statewide average for checkups and for the state's medical transportation system; 4) operate the state's managed care system consistently with the mandates of the decree; 5) operate toll-free numbers so as to ensure that all calls are answered promptly by a knowledgeable and helpful staff member; 6) provide case management to all class members who need it, statewide; 7) develop methods to study each agreed health outcome measure; and 8) provide EPSDT training for health care providers.

Frew, 109 F. Supp. 2d at 588.

In appeal No. 00-41112, the state defendants appealed the August 14, 2000 order.[11] On October 18, 2000, the Fifth Circuit stayed the order during the pendency of this appeal.

B.      Appeal No. 01-40667

After the state defendants noticed their appeal in No. 00-41112, plaintiffs filed in the district court a motion for leave to file a supplemental complaint (motion to supplement). The proposed supplemental complaint sought to add claims that dental services to the class were not available "at least to the extent that such care and services are available to the general population in the geographic area" under 42 U.S.C. § 1396a(a)(30)(A), and that dental services were not being provided "with reasonable promptness" under 42 U.S.C. § 1396a(a)(8).

The district court granted the motion to supplement. The state defendants then filed a motion to dismiss the supplemental complaint, arguing that the district court had no jurisdiction to grant the motion to supplement because of the pendency of the appeal to the Fifth Circuit. On May 17, 2001, the district court denied the motion to dismiss. In appeal No. 01-40667, the state defendants appeal the order denying the motion to dismiss.

We have consolidated appeal Nos. 00-41112 and 01-40667 for disposition herein.

---

[11] The parties dispute whether the notice of appeal covers only the "order of enforcement" or the memorandum opinion as well. In our view, both documents, entered simultaneously, constitute the district court's order granting the motion to enforce the consent decree and the "order" referenced in the notice of appeal.

DISCUSSION

A.     Appeal No. 00-41112

In the first appeal, the state defendants essentially make three arguments. They argue that the plaintiffs did not establish violations of federal rights which entitle them to relief under § 1983. They argue second that the State is immune from suit under the Eleventh Amendment. They lastly argue that the district court misinterpreted the consent decree and expanded the scope of the decree beyond its terms and the agreement of the parties. We do not reach the last issue, and address the first two below, after first satisfying ourselves of our jurisdiction.

1.     Appellate Jurisdiction

The district court's memorandum opinion and the accompanying "order of enforcement" are unusual documents. The district court found that certain provisions of the consent decree had been violated and that these provisions were enforceable, but did not take the next step of specifically ordering enforcement of the consent decree—an order that would amount to affirmative injunctive relief to the plaintiff class—other than directing the defendants to submit corrective action plans.

We nevertheless conclude that we have appellate jurisdiction to review the orders under 28 U.S.C. § 1292(a)(1) and the collateral order doctrine. Section 1292(a)(1) provides appellate jurisdiction over "[i]nterlocutory orders of the district courts . . . granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions . . . ."

11

The district court held that the consent decree was enforceable under §1983, and in so doing rejected arguments that its enforcement would violate the Eleventh Amendment. We hold that the ruling below was an order "refusing to dissolve or modify" an injunction under § 1292(a)(1). Further, insofar as the state defendants argued that enforcement of the consent decree ran afoul of the Eleventh Amendment, the collateral order doctrine allows immediate appellate review of an order denying a claim of Eleventh Amendment immunity.[12]

2.    Enforceability of Consent Decree under § 1983 and the Eleventh Amendment

The district court, while often making reference to statutory requirements and the consistency of the consent decree with the Medicaid Act,[13] did not consider it necessary to determine whether an alleged violation of the consent decree would constitute, in the absence of the decree, a statutory violation of the Medicaid Act remediable under § 1983. On the contrary, it held that "[i]n enforcing the consent decree, the court is bound solely

---

[12]  P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 147 (1993).

[13]  For example, the court stated that the consent decree's outreach provisions "stem from" federal requirements that states inform eligible persons of the availability of EPSDT services, Frew, 109 F. Supp. 2d at 589, and that the decree's corrective action plan requirement "is supported" by statutory requirements, id. at 677. The court also considered statutory requirements in its analysis of alleged violations of consent decree provisions concerning checkups, but only because these parts of the consent decree incorporated by reference certain statutory provisions. The court believed that otherwise "the requirements of federal law would be irrelevant to this court's construal of the decree." Id. at 607.

by its language," and that "an interpretation of the decree must be based strictly on the language of the decree, and not on the legal requirements of the Medicaid Act, except to the extent that those requirements are clearly imported by the language of the decree."[14] This was error.

While § 1983 is usually invoked in cases where a plaintiff is claiming a constitutional violation, by its terms it extends to both constitutional and statutory violations, since it provides a remedy to those who suffer a "deprivation of any rights, privileges, or immunities secured by the Constitution <u>and laws</u>" of the United States. Stating a claim under § 1983 requires a plaintiff to "allege a violation of rights secured by the Constitution or laws of the United States."[15] Section 1983 does not itself create any substantive rights; it only provides a remedy for the violation of a substantive federal right conferred elsewhere.[16]

Proof of a violation of a federal statute, by itself, does not entitle a plaintiff to relief under § 1983. Instead, in <u>Blessing v. Freestone</u>,[17] the Court explained that to obtain relief under § 1983, "a plaintiff must assert the violation of a federal <u>right</u>, not merely a

---

[14] <u>Frew</u>, 109 F. Supp. 2d at 594.

[15] <u>Lefall v. Dallas Indep. Sch. Dist.</u>, 28 F.3d 521, 525 (5th Cir. 1994).

[16] <u>Olabisiomotosho v. City of Houston</u>, 185 F.3d 521, 525 (5th Cir. 1999).

[17] 520 U.S. 329 (1997).

violation of federal law."[18]  Whether a statutory violation amounts to a violation of a

statutory right actionable under § 1983 depends on three factors recognized in Blessing:

> First, Congress must have intended that the provision in question benefit the plaintiff.  Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence.  Third, the statute must unambiguously impose a binding obligation on the States.  In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.[19]

Employing this test, the Court in Blessing held that 42 U.S.C. § 609(a)(8), a

provision of Title IV-D of the Social Security Act authorizing the Secretary of Health and

Human Services to reduce payments to a state that does not "substantially comply" with

Title IV-D, did not give rise to individual rights actionable under § 1983.[20]

In Wilder v. Virginia Hospital Ass'n,[21] the Supreme Court held that the Boren

Amendment to the Medicaid Act,[22] which required reimbursement according to rates that

a state finds "are reasonable and adequate to meet the costs which must be incurred by

efficiently and economically operated facilities," was enforceable by health care

---

[18]  Id. at 340.

[19]  Id. at 340-41 (citations, internal quotation marks omitted).

[20]  Id. at 344.

[21]  496 U.S. 498 (1990).

[22]  42 U.S.C. § 1396a(a)(13)(A) (1992) (repealed).

providers under § 1983.[23]  In making this determination the Court set out the same three factors described in Blessing above.[24]

In Evergreen Presbyterian Ministries Inc. v. Hood,[25] we applied the Blessing factors and held that one portion of one Medicaid provision created a federal right enforceable by Medicaid recipients, but not Medicaid providers, under § 1983.  We held that the portion of 42 U.S.C. § 1396a(a)(30)(A) relating to equal access gave recipients a federal right of action,[26] but that the district court had abused its discretion in holding that the plaintiff recipients had shown a substantial likelihood of success in proving a violation of this provision entitling them to preliminary injunctive relief.[27]

Applying the Blessing factors to the pending case, there is no doubt that under the first factor the Medicaid program generally is intended to benefit qualifying recipients such as members of the plaintiff class.  The Medicaid Act is, however, a large and complex statute, and whether plaintiffs seeking to enforce a federal right under the

---

[23]  Wilder, 496 U.S. at 512.

[24]  Id. at 509.

[25]  235 F.3d 908 (5th Cir. 2000).

[26]  Id. at 924.  Evergreen held that the "equal access" portion of § 1396a(a)(30)(A)—stating that a State plan must provide "such methods and procedures . . . as may be necessary . . . to assure that payments . . . are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area"—created a right of action for recipients under § 1983, but did not address the portion of subpart 30(A) relating to quality of care.  See id. at 927 n.24.

[27]  Id. at 934.

Medicaid Act can meet this requirement depends on which statutory provision or provisions they rely. In Evergreen, we further explained that receipt of an indirect benefit under the statutory provision in issue "is not sufficient to support a claim that [plaintiffs] are its intended beneficiaries."[28]

Similarly, moving to the second prong of the Blessing test, while some of the provisions of the Medicaid Act are not so vague and amorphous that enforcement would strain judicial competence, plaintiffs' claims can succeed only if predicated on those provisions.

Under the third Blessing factor, the Medicaid statute does impose some binding obligations on the states. With respect to the EPSDT program at issue in the pending case, 42 U.S.C. § 1396a(a) provides that state Medicaid plans "must" meet the federal mandates set out in that statute, including the requirements for EPSDT programs set out in § 1396a(a)(43). We have explained that once states choose to participate in Medicaid, they "are required to provide certain minimum mandatory services," including EPSDT services.[29] Again, however, we are not prepared to hold that every provision of the Medicaid Act which might be relevant to plaintiffs' claims imposes a binding obligation on the states.

In addition to the three factors described above, Blessing goes on to state:

---

[28] Id. at 929.

[29] Mitchell v. Johnston, 701 F.2d 337, 340 (5th Cir. 1983).

16

Even if a plaintiff demonstrates that a federal statute creates an individual right, there is only a rebuttable presumption that the right is enforceable under § 1983. Because our inquiry focuses on congressional intent, dismissal is proper if Congress specifically foreclosed a remedy under § 1983. Congress may do so expressly, by forbidding recourse to § 1983 in the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983.[30]

Under this last part of the Blessing analysis, Congress did not expressly foreclose resort to § 1983, or establish a comprehensive remedial scheme intended to supplant § 1983. While the Secretary of Health and Human Services is authorized to cut off federal funding to a State that fails to comply with the Medicaid statute,[31] there is no comprehensive enforcement scheme that would foreclose § 1983 relief under Blessing.[32]

It is clear that a violation of every provision of the Medicaid Act does not become actionable under § 1983 simply because some aspects of the Act meet the requirements of Blessing and related authority. Blessing itself cautioned against such a holding, since it found that the Social Security legislation at issue was a "multifaceted statutory scheme" containing many provisions which "do not fit our traditional three criteria for identifying statutory rights."[33] While the courts in Wilder and Evergreen held that violations of particular provisions of the Medicaid Act were actionable by certain plaintiffs under §

---

[30] Blessing, 520 U.S. at 341 (citation, internal quotation marks omitted).

[31] 42 U.S.C. § 1396c.

[32] See Wilder, 496 U.S. at 522 (holding that Medicaid Act's "administrative scheme cannot be considered sufficiently comprehensive to demonstrate a congressional intent to withdraw the private remedy of § 1983").

[33] Blessing, 520 U.S. at 344.

17

1983, it does not follow that every section of the Medicaid Act that might be relevant to plaintiffs' claims will support a § 1983 claim. In Blessing, the Court reasoned that a remand was warranted to allow the district court to construe the claims "in the first instance, in order to determine exactly what rights, considered in their most concrete, specific form, respondents are asserting. Only by manageably breaking down the complaint into specific allegations can the District Court proceed to determine whether any specific claim asserts an individual federal right."[34]

The district court's authority to enforce the consent decree is further limited by the Eleventh Amendment. This suit was brought against state officials in their official capacities, seeking injunctive relief under § 1983 and the authority of Ex Parte Young[35] and related authority.

A fundamental rule of federal jurisdiction, of which the Eleventh Amendment is an exemplification, is that the judicial power of the federal courts granted by the Constitution does not extend to suits by private parties against the states.[36] In order to accommodate both the supremacy of federal law and the Eleventh Amendment, Ex Parte Young allows a private suit against state officials to enjoin state conduct that violates

_____

[34] Id. at 346.

[35] 209 U.S. 123 (1908).

[36] Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 98-99 (1984).

18

federal law.[37]  "[T]he <u>Young</u> doctrine rests on the need to promote the vindication of federal rights."[38]  It "has not been provided an expansive interpretation."[39]

We addressed the enforceability of a consent decree in the face of Eleventh Amendment immunity in <u>Lelsz v. Kavanagh</u>.[40]  In that case the state defendants appealed a district court order purporting to enforce a consent decree by ordering the State to furlough a certain number of mentally ill patients in the State's care.[41]  We stated that the relief ordered, "in effect, requires state officials to comply with state law."[42]  We held that the district court was without jurisdiction to enforce the consent decree.[43]

The plaintiffs in <u>Lelsz</u> argued that the consent decree was enforceable under <u>Local Number 93, International Ass'n of Firefighters v. City of Cleveland</u>,[44] where the Supreme Court held that "a federal court is not necessarily barred from entering a consent decree merely because the decree provides broader relief than the court could have awarded after

---

[37]  <u>See</u> <u>id.</u> at 102-03; <u>Quern v. Jordan</u>, 440 U.S. 332, 337 (1979).

[38]  <u>Pennhurst</u>, 465 U.S. at 105.

[39]  <u>Id.</u> at 102.

[40]  807 F.2d 1243 (5th Cir. 1987).

[41]  <u>Id.</u> at 1245.

[42]  <u>Id.</u> at 1247.

[43]  <u>Id.</u> at 1255.

[44]  478 U.S. 501 (1986) ("<u>Firefighters</u>").

a trial."[45]  We rejected this argument, reasoning that if the court had no jurisdiction,

Firefighters did not apply.[46]  We further explained that Firefighters

> addressed the entry of a consent decree and held that the parties' agreement
> could result in a decree whose terms would exceed the court's remedial
> authority under a governing statute.  It does not enlarge the court's latitude
> to issue its own, different order enforcing or modifying the decree, for in
> that case we presume the court must fall back on its inherent jurisdiction. . .
> .
> . . . .
>        [T]he right/remedy distinction urged by appellees inevitably collides
> with the principles of federalism and comity which animate the Eleventh
> Amendment . . . .  Therefore, the only legitimate basis for federal court
> intervention, consistent with the Eleventh Amendment is the vindication of
> federal rights.  If a federal court remedy unfounded in federal law intrudes
> into the governance of matters otherwise presided over by the states, no
> federal right has been vindicated.[47]

In Saahir v. Estelle,[48] we also addressed the enforceability of a consent decree.  In

that case, the district court had entered a consent decree approving a settlement between

the plaintiff inmate and the state defendants which allowed the plaintiff to order tapes.[49]

The plaintiff filed a motion for contempt when some of his tapes were confiscated.[50]  We

recognized that in Lelsz we had held " that the district court lacked jurisdiction to enforce

---

[45]  Id. at 525.

[46]  Lelsz, 807 F.2d at 1252.

[47]  Id.

[48]  47 F.3d 758 (5th Cir. 1995).

[49]  Id. at 760.

[50]  Id.

20

a consent decree against the State to the extent that the relief ordered in the decree was based on state law . . . because the only legitimate basis for federal court intervention consistent with the Eleventh Amendment was the vindication of federal rights."[51] We held that enforcing the consent decree to allow the plaintiff to keep non-religious tapes was not required under state law, and further held that

> enforcing the provision would not be required by any federal or constitutional law, as we fail to discern any First Amendment protections except as to the religious tapes. Because "the only legitimate basis for federal court intervention, consistent with the Eleventh Amendment is the vindication of federal rights," Lelsz, 807 F.2d at 1252, the federal courts have no jurisdiction to enforce the provision as it relates to the non-religious tapes.[52]

Underlying our reasoning in Lelsz and Saahir is the jurisdictional nature of the Eleventh Amendment. Eleventh Amendment immunity is in "the nature of a jurisdictional bar."[53] Regardless of what the parties agreed to in the consent decree, "the Eleventh Amendment is jurisdictional in the sense that it is a limitation on the federal court's judicial power."[54] The Eleventh Amendment "is a specific constitutional bar against hearing even federal claims that otherwise would be within the jurisdiction of the federal courts."[55]

---

[51] Id. at 761.

[52] Id.

[53] Edelman v. Jordan, 415 U.S. 651, 678 (1974).

[54] Calderon v. Ashmus, 523 U.S. 740, 745 n.2 (1998).

[55] Pennhurst, 465 U.S. at 120.

We recognized in Lelsz[56] and Saahir[57] that a federal court "must fall back on its inherent jurisdiction" when it issues an order enforcing a consent decree. For our purposes, the essential holding of Lelsz and Saahir is that a consent decree like the one entered by the district court is not enforceable against the State or its officials except to vindicate a federal right granted in the federal Constitution or a federal statute, since "the consent decree does not enlarge the courts' jurisdiction."[58] Blessing sets out the factors used in deciding whether a statutory violation amounts to a violation of a "federal right" actionable under § 1983.

The district court held that "the Firefighters test will be applied to the decree provisions sought to be enforced by plaintiffs."[59] In Firefighters the Supreme Court upheld a consent decree that, according to the petitioner, granted relief that was unavailable under the statute in issue. The Court, without reaching the issue of statutory construction, concluded that "a federal court is not necessarily barred from entering a consent decree merely because the decree provides broader relief than the court could have awarded after a trial."[60] In the pending case, the district court, under its interpretation of the "Firefighters test," erroneously held that

---

[56] Lelsz, 807 F.2d at 1252.

[57] Saahir, 47 F.3d at 761.

[58] Id. at 762.

[59] Frew, 109 F. Supp. 2d at 671.

[60] Firefighters, 478 U.S. at 525.

to sustain federal court jurisdiction to approve a consent decree against state officials, the remedies in the decree must only serve to: 1) resolve a dispute within the court's subject matter jurisdiction, 2) come within the general scope of the case made by the pleadings, and 3) further the objectives of the law upon which the complaint was based.[61]

Although the district court engaged at some length in a generalized discussion of the  Blessing factors,[62] it is clear to us that the district court did not conduct a particularized Blessing analysis as to each alleged violation of the consent decree.  For example, rather than deciding whether a statutory violation took place and applying the Blessing factors, the court, in concluding that the training provisions of the consent decree were enforceable, agreed with the state defendants that training "is not a requirement of federal law."[63]  It nevertheless found under the "Firefighters test" that the training provisions "served to resolve this dispute, and they come within the general scope of the case made by the pleadings," and that training "clearly furthers the objectives of the EPSDT statute."[64]  The court made the same findings in concluding that the toll-free line provisions of the decree were enforceable, although agreeing with the state defendants that "no such lines are required by federal law or regulation."[65]  Instead of determining whether each alleged violation of the consent decree was a statutory

---

[61] Frew, 109 F. Supp. 2d at 666.

[62] Id. at 661-665, 672 n. 202.

[63] Id. at 677.

[64] Id.

[65] Id.

violation actionable under Blessing, the court held that "an interpretation of the decree must be based strictly on the language of the decree, and not on the legal requirements of the Medicaid Act, except to the extent that those requirements are clearly imported by the language of the decree."[66]

Firefighters is a consent decree case but is not an Eleventh Amendment case,[67] and does not therefore address the deference federal courts must show for the Eleventh Amendment when called upon to enjoin state officials under Ex Parte Young. "Eleventh Amendment immunity represents a real limitation on a federal court's federal-question jurisdiction."[68] Moreover, we expressly distinguished Firefighters in both Lelsz and Saahir, reasoning that (1) Firefighters does not help the plaintiff if the district court lacks jurisdiction as a result of the Eleventh Amendment, and (2) even if a federal court is not necessarily barred from entering a consent decree providing broader relief than it could have awarded at trial, it must fall back on its own jurisdiction when it issues an order enforcing the decree.[69] The Eleventh Amendment limits that jurisdiction to the enforcement of federal rights.

---

[66] Id. at 594.

[67] Firefighters involved a suit against the City of Cleveland. Cities do not enjoy Eleventh Amendment immunity. Evans v. City of Bishop, 238 F.3d 586, 589 (5th Cir. 2000).

[68] Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 270 (1997).

[69] Lelsz, 807 F.2d at 1252; Saahir, 47 F.3d at 761.

24

Plaintiffs argue that <u>Lelsz</u> should be limited to a consent decree based only on state law. The district court, likewise, would limit <u>Lelsz</u> to suits to enforce only state law claims, and "declined" to apply it.[70] We do not read <u>Lelsz</u> so narrowly, and in any event <u>Saahir</u> cannot be read as limited to state-law-based consent decrees. Insofar as the district court noted authority that found the distinction we drew in <u>Lelsz</u> and <u>Saahir</u> between jurisdiction to enter and jurisdiction to enforce a consent decree "utterly indefensible" or "untenable,"[71] the district court, and we, are bound by the law of our circuit.

Before the district court can remedy a violation of a provision of the consent decree, plaintiffs must demonstrate that any such consent decree violation is also a violation of a federal right, by showing (1) a statutory violation of a specific provision of the Medicaid Act, (2) which was intended to benefit plaintiffs, (3) which is not so vague and amorphous that its enforcement would strain judicial competence, and (4) which imposes a binding obligation on the states. Lest the court run afoul of <u>Blessing</u>, it must not paint "with too broad a brush"[72] by failing to "separate out the particular rights it believe[s] arise from the statutory scheme."[73] The <u>Blessing</u> criteria can only be properly applied when the claims are "broken down into manageable analytic bites."[74]

---

[70] <u>Frew</u>, 109 F. Supp. 2d at 671.

[71] <u>Id.</u> at 670.

[72] <u>Blessing</u>, 520 U.S. at 342.

[73] <u>Id.</u> at 345.

[74] <u>Id.</u> at 342.

25

3.      Relief Available to Plaintiffs

a.      Whether a Federal Court Can Set EPSDT Performance and Participation Standards

As discussed above, plaintiffs are only entitled to injunctive relief if they can show a violation of specific statutory provision that is actionable under § 1983 because it satisfies the Blessing test.  Although relief under § 1983 for a violation of EPSDT provisions may be available, perfect state compliance with these provisions is not required.  While a district court should have some discretion to craft an injunction to remedy violation of the Medicaid Act, there are limits on the relief available from a federal court.

We reach this conclusion based on our understanding of congressional intent.  Our goal, of course, in construing a statute is to give effect to congressional intent, and we begin this task by looking to the language of the statute itself.[75]

In the pending case, the district court did not direct that particular individuals receive EPSDT services to which they were entitled under federal law.  It has instead taken upon itself the task of reworking the procedures and mechanisms whereby EPSDT services are provided to the totality of eligible participants.  The court has become overseer of the State's Medicaid plan.  As such, the court assumes the role of assuring that the State's plan meets federal mandates, which in turn raises the issue of whether the

---

[75]  Ruiz v. Estelle, 161 F.3d 814, 819 (5th Cir.1998).

plan must always, unfailingly, provide the EPSDT services described in the Medicaid Act. We think that is not required.

Congress did not intend that a court can require that a state participating in the Medicaid program must always provide every EPSDT service to every eligible person at all times. Perfect compliance with such a complex set of requirements is practically impossible, and we will not infer congressional intent that a state achieve the impossible. Furthermore, looking to §1396a(a)(43), even though it refers in subpart (A) to providing notice to "all persons," and refers in subpart (B) to the provision of EPSDT screening services in "all cases" where such services are requested, the opening text of § 1396a(a) and § 1396a(a)(43) modify all of this language by only requiring that a state "plan" must "provide for" meeting these requirements. In § 1396a(b), Congress vested in the Secretary of Health and Human Services (Secretary) the initial responsibility for approving state plans. Section 1396a(a)(43)(D) requires that the state plan provide for reporting certain data including "the State's results in attaining the participation goals set for the State under section 1396d(r) of this title." Section 1396d(r) provides:

> The Secretary shall, not later than July 1, 1990, and every 12 months thereafter, develop and set annual participation goals for each State for participation of individuals who are covered under the State plan under this subchapter in early and periodic screening, diagnostic, and treatment services.

In § 1396c, the Secretary is authorized to reduce or eliminate, in its discretion, federal funding for state plans which are not in compliance with § 1396a.

27

In our view, Congress has therefore spoken to the success expected of a state plan: it should meet EPSDT participation goals set by the Secretary. Under the third prong of Blessing, these are the only participation goals which are unambiguously imposed on the states. We do not read the statute as allowing a federal district court to require a higher standard of success. Congress did not in our view create such a federal right. Furthermore, under the second prong of Blessing, allowing federal courts, which are hardly expert at the intricacies of providing volume health care services to the poor, to choose their own performance goals would in our view render the EPSDT provisions so vague and amorphous as to strain judicial competence.

Moreover, we believe that plaintiffs cannot sue under § 1983 to require a plan to meet statewide or systemwide participation or performance measures, because, under Blessing, state compliance with such standards is not an individualized right actionable under § 1983. In Blessing, the court explained:

> [T]he requirement that a State operate its child support program in "substantial compliance" with Title IV-D was not intended to benefit individual children and custodial parents, and therefore it does not constitute a federal right. Far from creating an individual entitlement to services, the standard is simply a yardstick for the Secretary to measure the systemwide performance of a State's Title IV-D program. Thus, the Secretary must look to the aggregate services provided by the State, not to whether the needs of any particular person have been satisfied. A State substantially complies with Title IV-D when it provides most mandated services (such as enforcement of support obligations) in only 75 percent of the cases reviewed during the federal audit period. 45 C.F.R. § 305.20(a)(3)(iii) (1995). States must aim to establish paternity in 90 percent of all eligible cases, but may satisfy considerably lower targets so long as their efforts are steadily improving. 42 U.S.C. § 652(g). It is clear, then, that even when a State is in "substantial compliance" with Title IV-D,

28

any individual plaintiff might still be among the 10 or 25 percent of persons whose needs ultimately go unmet.  Moreover, even upon a finding of substantial noncompliance, the Secretary can merely reduce the State's AFDC grant by up to five percent; she cannot, by force of her own authority, command the State to take any particular action or to provide any services to certain individuals. In short, the substantial compliance standard is designed simply to trigger penalty provisions that increase the frequency of audits and reduce the State's AFDC grant by a maximum of five percent.  As such, it does not give rise to individual rights.[76]

An analogous situation is presented here.  The statute authorizes the Secretary to set certain participation goals, and to cut federal funding if "there is a failure to substantially comply" with statutory provisions.[77]  Under <u>Blessing</u>, a state's failure to meet such a participation goal or other systemwide performance standard does not give rise to individual rights actionable under § 1983.  The fact that plaintiffs have pursued their suit as a class action is of no consequence.  A class action is merely a procedural device; it does not create new substantive rights and cannot extend the subject matter jurisdiction of the district court.[78]

      b.     <u>Whether the Plaintiffs Have Shown a Statutory Violation</u>

We now proceed to decide whether consent decree violations found by the district court amount to a statutory violation of the EPSDT provisions actionable under § 1983.

---

[76]  <u>Blessing</u>, 520 U.S. at 343-44.

[77]  42 U.S.C. § 1396c.

[78]  <u>See</u> <u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. 591, 613 (1997).

29

Rather than focusing on the statutory requirements, the court focused on the consent decree requirements and proceeded to find numerous consent decree violations. These consent decree provisions impose standards and requirements on the State which are not required by the Medicaid statute.

Looking to statutory EPSDT provisions, the requirement of subpart 43(B) that a state plan provide screening services is limited to the provision of services "where they are requested." We agree with the state defendants that a statutory violation of this requirement cannot occur except in cases where eligible persons request screening services. The district court recognized that the evidence did not support a finding that screening services were ever denied after they were so requested, noting that "[s]everal witnesses testified that defendants are not aware of a single class member who has requested services and not subsequently received those services."[79]

Whether the state plan has met performance goals set by the Secretary is unclear from the record. Regardless of the terms of the consent decree, the district court cannot impose higher performance standards than those set by the Secretary, and cannot under § 1983 impose systemwide performance or participation standards. The court did not find specific EPSDT statutory violations which might be actionable under § 1983, nor does any amount of sifting through the evidence allow us to make such findings. Instead the

---

[79] Frew, 109 F. Supp. 2d at 607 n.51.

court found violations of provisions of the consent decree which are not required by the Medicaid Act.

The district court first found violations of consent decree provisions relating to outreach, including provisions that the State "effectively" inform the class about EPSDT services and conduct outreach efforts to encourage use of these services.[80]  The Medicaid Act EPSDT provisions, at subpart 43(A), only require a state plan providing for "informing all [eligible persons] of the availability of [EPSDT] services."  It does not expressly require "effective" conveyance of information, and does not require outreach programs that extend beyond an effort at informing eligible persons of available EPSDT services.  As explained above, we read the Act to limit the success required from such efforts to meeting performance standards set by the Secretary.  The district court did not find that any such standards were violated, and in any event lacks the power to impose systemwide standards under § 1983, since such standards do not give rise to individual rights.  Instead, employing its understanding of the consent decree, and finding itself "bound solely by its language,"[81] the district court concluded that the State's outreach efforts fell short of its understanding of the dictates of the consent decree.

---

[80]  Id. at 589-600.

[81]  Id. at 594.

The court next considered whether the State had violated consent decree provisions concerning medical and dental checkups.[82] Insofar as the court concluded that insufficient numbers of Medicaid recipients were receiving medical and dental checkups, the court again failed to recognize that the only participation goals mandated under the statute are those set by the Secretary, and that, under Blessing, such performance goals do not give rise to individual rights actionable under § 1983. The court was not authorized or competent to impose its own participation goals.

The district court also held that, with respect to checkups, the State had failed to report certain data as required by ¶¶ 212 and 284 of the consent decree, which require the state defendants to report the number and percent of recipients who receive all their scheduled medical and dental checkups. The Medicaid Act's EPSDT provision does not require states to provide this data. Certain other data must be reported under 42 U.S.C. § 1396a(a)(43)(D), but even as to this requirement we do not believe that it creates a federal right actionable under § 1983. Blessing held that requirements which benefit eligible individuals "only indirectly," such as requirements for a state's data processing system which "maintain the data necessary to meet federal reporting requirements," do not give rise to "individualized rights" actionable under § 1983.[83] Reporting requirements, likewise, do not give rise to individualized rights.

---

[82] Id. at 600-613.

[83] Blessing, 520 U.S. at 344-45.

The district court also discussed, with respect to dental checkups, evidence of a shortage of dentists. However, Blessing makes clear that staffing mandates, even where such mandates have a statutory basis, are not enforceable under § 1983, since they do not give rise to individual rights, and because enforcing an undefined standard of "sufficient" staffing would strain judicial competence.[84]

The district court next found that the State had violated provisions of the consent decree concerning corrective action plans.[85] The consent decree has provisions requiring the State to report participation by class members in medical and dental checkups by county or cluster of counties, and to develop corrective action plans for "lagging" counties with relatively low participation rates. The Medicaid Act does not impose such reporting requirements and corrective action plans, and for the reasons discussed above, such reporting and systemwide corrective action mandates, even if found in the statute, would not give rise to individuals rights enforceable under § 1983. And again, the district court has no power to create its own performance or participation standards for "lagging" counties.

The court next turned to alleged violations of consent decree provisions concerning the receipt of EPSDT services through managed care providers.[86] Without

---

[84] Id. at 345.

[85] Frew, 109 F. Supp. 2d at 613-18.

[86] Id. at 618-37.

belaboring the complex facts presented concerning these provisions, the court discussed

evidence that the State's data was flawed, that participation rates for class members in

managed care was lower than the rates for other class members, and that the level of care

for managed care class members was inadequate. The court did not find a specific

violation of a statutory managed care requirement, assuming that one exists. We agree

with the state defendants that there is no basis in federal law for heightened or additional

benefits to class members receiving care through managed care providers. As discussed

above, the State's failure if any to provide reports or data under the consent decree cannot

amount to a violation of individual rights actionable under § 1983. Insofar as the court

found that participation rates were lower in managed care, the court cannot impose its

own participation rates for managed care patients.

The court separately found violations of a consent decree provision concerning

accelerated managed care services to migrant farm workers. Again, the court did not rely

on a statutory provision of the Medicaid Act requiring such special services. The court

also found a violation of ¶ 194 of the consent decree, requiring "appropriate training" of

health care providers in the managed care system. Such training is not mandated by

statute, as the district court noted,[87] and is no more actionable under § 1983 than the

"sufficient staff" mandate whose enforcement via a § 1983 action was foreclosed in

Blessing, as discussed above.

---

[87] Id. at 677 ("Training, defendants correctly argue, is not a requirement of federal law.").

34

The district court next considered toll-free line requirements set out in ¶ 247 of the consent decree,[88] and found that the State had violated requirements that recipients receive "prompt service" from an operator who is "knowledgeable, helpful, and polite." As the district court acknowledged, "no such lines are required by federal law or regulation."[89] Even if there were such statutory requirements, a toll-free line system would be akin to the data processing system which the Court in Blessing held did not give rise to individualized rights actionable under § 1983.

The district court next turned to consent decree provisions relating to case workers who assist class members in arranging for the treatment they need.[90] The court did not find a statutory violation actionable under § 1983, but instead focused on its interpretation of the consent decree. To the extent that the district court found that participation levels by EPSDT recipients or requirements for adequate staffing and training of case managers had not been met, we again do not believe that such failures can support a § 1983 violation. The same can be said for the last alleged violations of the consent decree considered by the district court, namely the alleged failure to report

---

[88] Id. at 637-646.

[89] Id. at 677.

[90] Id. at 646-654.

certain data relating to outcome measures,[91] and the alleged failure to provide training for health care providers.[92]

In short, so far as we can tell from this record, plaintiffs have not established any violations of the EPSDT provisions of the Medicaid statute which are actionable under § 1983 and the Ex Parte Young exception to the Eleventh Amendment.

4.      Other Issues

a.      Waiver of Sovereign Immunity

After they filed their appellees' brief, plaintiffs filed two FED. R. APP. P. 28(j) letters, referring the court to our decision in Watson v. Texas[93] and the Supreme Court's decision in Lapides v. Board of Regents of the University System of Georgia.[94]  For the first time,[95] plaintiffs argued in these letters that the State waived its Eleventh

---

[91]  Id. at 654-658.

[92]  Id. at 658-660.

[93]  261 F.3d 436 (5th Cir. 2001).

[94]  122 S. Ct. 1640 (2002).

[95]  Although Watson and Lapides were decided after plaintiffs submitted their brief and were the proper subject of Rule 28(j) letters, we question whether plaintiffs should have raised the issue of waiver of Eleventh Amendment immunity at an earlier stage in this litigation.  Waiver of Eleventh Amendment immunity is certainly not a new concept. Generally, we do not review issues raised for the first time on appeal unless they involve purely legal questions and failure to consider them would result in manifest injustice. Varnado v. Lynaugh, 920 F.2d 320, 321 (5th Cir. 1991).  Further, "[i]n the absence of manifest injustice, this court will not consider arguments belatedly raised after appellees have filed their brief."  Najarro v. First Fed. Sav. & Loan Ass'n of Nacogdoches, 918 F.2d 513, 516 (5th Cir. 1990).  In these circumstances, however, we consider this waiver issue.  There are no disputed facts relevant to this issue and it presents a question of law.

Amendment immunity by voluntarily entering into the consent decree. The state

defendants argue that there was no waiver because the consent decree was negotiated by

the office of the Attorney General, and only the Texas Legislature can waive the State's

sovereign immunity. We need not decide this thorny question.[96]

Instead, we hold that under well-established law for determining a waiver of

Eleventh Amendment immunity, the State did not do so in this case. "The Supreme Court

has made it clear that we may find a waiver of a state's Eleventh Amendment immunity

---

Further, as discussed above, Eleventh Amendment immunity is jurisdictional in nature, and the court of appeals has a continuing duty to consider, sua sponte if necessary, the basis of the district court's jurisdiction. Solsona v. Warden, F.C.I., 821 F.2d 1129, 1132 n.2 (5th Cir. 1987).

[96] In Watson, in which we held that a dispute fell within the State's waiver of sovereign immunity contained in a settlement agreement, we stated: "We presume that the attorney general for the State of Texas had the power to sign the Agreement on behalf of Texas and had the power to waive the state's sovereign immunity." Watson, 261 F.3d at 441 n.11. However, the Texas Supreme Court has recently stated that it "has long recognized that it is the Legislature's sole province to waive or abrogate sovereign immunity." Texas Natural Res. Conservation Comm'n v. IT-Davy, 74 S.W.3d 849, 853 (Tex. 2002) (internal quotation marks omitted). See also Dep't of Pub. Safety v. Great Southwest Warehouses, Inc., 352 S.W.2d 493, 495 (Tex. Civ. App.–Austin 1961, writ ref'd n.r.e.) ("[T]he Attorney General was without legal power or authority to waive the right of the State to immunity from the suit . . . ."). While we have stated that a waiver of Eleventh Amendment immunity is decided under federal standards, see In re Allied-Signal, Inc., 919 F.2d 277, 281 n.4 (5th Cir. 1990), we have also recognized that, in determining whether a state official or entity has authority to waive Eleventh Amendment immunity, we look to state law, see Magnolia Venture Capital Corp. v. Prudential Sec., Inc., 151 F.3d 439, 444 (5th Cir. 1998). To further complicate matters, we have recognized that "a state may waive its common law sovereign immunity under state law, without waiving its Eleventh Amendment immunity under federal law." Allied Signal, 919 F.2d at 281 n.4.

in only the most exacting circumstances."[97] The states's consent to suit must be "unequivocally expressed."[98]

The State has not unequivocally waived its Eleventh Amendment immunity. The consent decree expressly states in paragraph 301 that "Defendants do not concede liability." The state defendants repeatedly raised in the district court an Eleventh Amendment defense to the enforcement of the decree, contending that the entry of the consent decree did not expand the district court's jurisdiction, and that a violation of the consent decree, by itself, was "of no consequence." It made numerous other statements to the district court in pleadings and in open court indicating that it did not intend to waive its Eleventh Amendment immunity, arguing for example that "[i]f the court determines that no federal right has been violated it lacks jurisdiction to impose a remedy even if it determines that Defendants have violated a term of the decree." The district court rejected these arguments.[99]

A critical distinction between the pending case and the cases cited in the Rule 28(j) letters—Watson and Lapides—is that in those cases the state voluntarily chose to submit itself to the jurisdiction of the federal court. In Watson, the State of Texas elected to bring its tobacco action in federal court. In Lapides, the state defendants removed the

_____

[97] Magnolia Venture Capital Corp., 151 F.3d at 443.

[98] Id. at 443 (quoting Pennhurst, 465 U.S. at 99).

[99] Frew, 109 F. Supp. 2d at 665-671.

case to federal court.[100]  These cases and others establish that a state can waive its

Eleventh Amendment immunity by voluntarily invoking the federal court's jurisdiction,[101]

but in the pending case the State did not do so; the state officials were sued as defendants.

The State has not waived its Eleventh Amendment immunity.

b.        Westside Mothers

The state defendants argue in their reply brief that we should accept arguments

embraced by a district court in Westside Mothers v. Haveman.[102]  That case concerned a

challenge to Michigan's EPSDT program.  The district court held that the Medicaid

statute, as legislation enacted pursuant to the Spending Clause,[103] was not the supreme

---

[100]  Lapides, 122 S. Ct. at 1642.

[101]  See id. at 1644 (recognizing "general legal principle" that a state waives its Eleventh Amendment immunity when it voluntarily invokes the federal court's jurisdiction); College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 675-76  (1999) ("Generally, we will find a waiver . . . if the State voluntarily invokes our jurisdiction . . . .").

[102]  133 F. Supp. 2d 549 (E.D. Mich. 2001), aff'd in part, rev'd in part, 289 F.3d 852 (6th Cir. 2002).  Westside Mothers was decided after the state defendants had filed its initial brief in the pending appeal.  We granted leave to the state defendants to file an additional brief on the issues raised in Westside Mothers, and also granted leave the United States to file an amicus curiae brief out of time on the Westside Mothers issues. In addition, much of the state defendants' briefing in appeal No. 01-40667, addressed below, is inspired by the district court's novel analysis in Westside Mothers.

[103]  U.S. CONST. art. I, § 8, cl. 1.

39

law of the land under the Supremacy Clause[104] and therefore the Ex Parte Young

exception to Eleventh Amendment state immunity was inapplicable.[105]

Suffice it to say that we decline to follow this ruling. We have not recognized a

"Spending Clause exception to the Ex Parte Young exception" to the Eleventh

Amendment. The district court's decision in Westside Mothers on this issue has now

been reversed by the Sixth Circuit,[106] which noted that the Spending Clause analysis of

the district court was inconsistent with a number of Supreme Court cases.[107] We agree

with the Sixth Circuit that "laws validly passed by Congress under its spending powers

are supreme law of the land."[108] For purposes of the Supremacy Clause and Ex Parte

Young, the mandates set out in Medicaid statute are more than contractual; they are

federal law.

The district court in Westside Mothers concluded that the Ex Parte Young

exception to Eleventh Amendment immunity was unavailable for several reasons besides

---

[104] U.S. CONST. art. VI, cl. 2.

[105] Westside Mothers, 133 F. Supp. 2d at 561-62.

[106] Westside Mothers v. Haveman, 289 F.3d 852 (6th Cir. 2002).

[107] Id. at 859-60 (citing Townsend v. Swank, 404 U.S. 282 (1971), and other cases).

[108] Id. at 860.

40

the Spending Clause rationale. These reasons were also rejected on appeal, and we

likewise find none of them persuasive.[109]

_____

[109] Briefly, the district court in Westside Mothers held that Ex Parte Young was inapplicable to enforce Medicaid legislation for the additional reasons that (1) the state is the real party in interest, (2) the court lacks authority to enjoin state officers performing discretionary, as opposed to ministerial, functions, and (3) where the statutory scheme provides a remedy, the court may not substitute an alternative form of relief under § 1983. Westside Mothers, 133 F. Supp. 2d at 562-75.

As to the first reason, Ex Parte Young cannot be swept aside because the state is the real party in interest. The raison d'etre for Ex Parte Young and its continuing significance in our constitutional scheme is that it provides an exception to the Eleventh Amendment allowing injunctive relief against state officials where the state itself is for all practical purposes the real party in interest, in order to accommodate the Supremacy Clause. In all such suits state officials are sued in their official capacities, although the state is the real party in interest. The Supreme Court has observed that "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989) (citation omitted). Hence, Ex Parte Young is often described as employing a legal "fiction." E.g., Okpalobi v. Foster, 244 F.3d 405, 411 (5th Cir. 2001) (en banc); Brennan v. Stewart, 834 F.2d 1248, 1252 (5th Cir. 1988).

As to the second reason—that the court cannot compel state officials to perform discretionary functions—we again note that states participating in the Medicaid program must meet federal statutory mandates. For purposes of Ex Parte Young injunctive relief, states and their agents have no "discretion" to violate federal law. Hence, Young itself recognized that "[a]n injunction to prevent [a state officer] from doing that which he has no legal right to do is not an interference with the discretion of an officer." Ex Parte Young, 209 U.S. at 159.

The third reason—that the statutory scheme provides a remedy—is based on the district court's interpretation of Seminole Tribe of Fla. v. Florida, 517 U.S. 44 (1996). In that case the Court found that, in light of "the carefully crafted and intricate remedial scheme," id. at 73-74, set forth in the statute in question, Congress did not intend to create an Ex Parte Young remedy for violation of the statute. In contrast to the statutory scheme at issue in Seminole Tribe, see id. at 49-50, the Medicaid Act does not have an intricate remedial scheme regulating noncompliance by a state. The only statutory remedial sanction available under the Medicaid statute is that the Secretary of Health of Human Services can cut funding to the state. 42 U.S.C. § 1396c.

41

B.    Appeal No. 01-40667

While we have jurisdiction over the appeal because of the Eleventh Amendment issue, which is an issue that can be raised at any point because it is jurisdictional, there is no need to say more about the limits of the district court's jurisdiction.  Plaintiffs are objecting to the shortage of transportation for class members to obtain dental services and to the rates of payment set by the Texas Legislature.  Unless plaintiffs can prove that the right to dental services is being denied by the defendants, the court cannot act.  We therefore vacate the order addressing the motion to dismiss.

CONCLUSION

The orders of the district court in both appeals are VACATED and the case is REMANDED for whatever proceedings that may be consistent with this opinion.